IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL PAUL WILLIAMS, ) | No. C 09-5314 MMC (PR) |
| Plaintiff, ) | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S SECOND MOTION FOR ORDER COMPELLING PRISON OFFICIALS TO PHOTOCOPY LEGAL DOCUMENTS IN EXCESS OF FIFTY PAGES; REFERRING CASE FOR SETTLEMENT PROCEEDINGS; DIRECTIONS TO CLERK** |
| v. ) | |
| ROBERT A. HOREL, et al., ) | |
| Defendants. ) | |
| _____ ) | **(Docket Nos. 15, 18, 28)** |

On November 9, 2009, plaintiff, a California prisoner incarcerated at Pelican Bay State Prison ("PBSP") and proceeding pro se, filed the above-titled civil rights action under 42 U.S.C. § 1983, claiming violations of his right to the free exercise of his religion under the First Amendment and the Religious Land Use and Institutionalized Persons Act. Thereafter, the Court found plaintiff had stated cognizable claims for relief and ordered the complaint served on eight defendants. Now pending before the Court are two dispositive motions filed by defendants: (1) a motion for summary judgment, and (2) a motion to dismiss pursuant to the unenumerated portion of Rule 12(b) of the Federal Rules of Civil Procedure, the latter on

1  the ground plaintiff failed to exhaust administrative remedies. Plaintiff has opposed the
2  motions, and defendants have filed replies. Also before the Court is plaintiff's second
3  motion for a court order directing PBSP to provide plaintiff copies of legal documents in
4  excess of fifty pages.

## BACKGROUND

6  The following facts are taken from plaintiff's verified complaint and/or are
7  undisputed:

8  Plaintiff is a member of the Buddhist religion, which requires him to adhere to a
9  vegetarian diet. (Compl. at 3, 7.) Plaintiff has received a special religious vegetarian diet
10 from PBSP since 2004, but several years ago prison officials modified the diet to consist of
11 inedible and nutritionally inadequate food. (Id. at 7.)[1] On June 11, 2008, for example,
12 plaintiff received his evening meal tray and noticed it was missing rice and the extra scoop of
13 beans that typically were used to substitute for the meat portions served on the "regular" non-
14 vegetarian trays. (Id. at 7-8.) When plaintiff alerted the floor officer to the missing items, he
15 was told that the special religious vegetarian food trays were sufficiently prepared and that
16 plaintiff should file an inmate appeal if he did not like the answer. (Id.)

17 On June 17, 2008, plaintiff received his evening meal tray, which consisted of four
18 ounces of Teasdale beans that he was unable to consume, four ounces of white rice, two
19 ounces of "wilted or burnt, overly cooked vegetables," and "a small portion of wilted or
20 decaying salad." (Id. at 8-9.) On June 18, 2008, plaintiff received his evening meal tray and
21 discovered meat gravy was on the tray and covering parts of his food. (Id. at 9.) When
22 plaintiff alerted the floor officer, he was told to eat around the gravy or file an inmate appeal

---

[1] California Code of Regulations ("CCR") title 15, § 3054 sets out the regulatory guidelines concerning prisoners' special religious dietary needs. Under § 3054(a), "[e]ach institution shall make reasonable efforts, as required by law, to accommodate those inmates who have been determined . . . to require a religious diet." The facility chaplain must verify an inmate's special religious dietary needs. 15 CCR § 3054.4. Plaintiff has received a chaplain's approval for a religious vegetarian diet. (Decl. L. Stocker Supp. Defs.' Mot. Summ. J., Ex. A.)

2

1 if he did not like the answer. (Id. at 9-10.)

2 On July 6, 2008, plaintiff received his evening meal tray, on which he was given three
3 slices of cheese to substitute for the four-ounce beef patty served on the regular non-
4 vegetarian trays, which substitution, according to plaintiff, fell short of the "equivalent
5 protein factor" that PBSP was required to provide for religious vegetarian inmates under the
6 "state standardized menu." (Id. at 10-11.) When plaintiff alerted the floor officer, he was
7 told that he did not have the right to dictate what was on the menu or to dictate portion size.
8 (Id. at 11.)

9 On August 23, 2008, plaintiff received his evening meal tray and discovered beef
10 gravy in his vegetables. (Id. at 15.) On September 7, 2008, plaintiff received his evening
11 meal tray and found no protein substitute for the baked chicken served on the regular trays.
12 (Id. at 16.) Between six and sixteen times per month from February 2009 to August 2009,
13 plaintiff was given Teasdale beans, served cold and out of a can, as a protein substitute,
14 which beans, according to plaintiff, are inedible, thereby forcing him to go without protein
15 during the meals in which they are served. (Id.) Plaintiff continued to receive many meals
16 with burnt vegetables, rotten salad, and/or three slices of cheese as a protein substitute. (Id.
17 at 14, 16, 18, 20.) Plaintiff's complaints to the floor officer continued to go unheeded. (Id. at
18 15-17, 19, 23.) According to plaintiff, his diet fell short of the two hot meals per day
19 required by state regulations. (Id. at 11.)

20 Plaintiff's administrative appeals concerning his diet have been denied or partially
21 granted by officials at PBSP and the California Department of Corrections and Rehabilitation
22 ("CDCR"). (Id. at 11-14, 17-18.) Specifically, plaintiff was told that the current vegetarian
23 menu already supplies a nutritionally balanced diet such that "this part of the appeal was
24 granted" (id. at 12), and the appeals were denied to the extent they requested a change in the
25 menu (id. at 12-13).

26 Defendants were employed at PBSP and CDCR at the time of the events alleged in the
27 complaint. Defendant Robert A. Horel ("Horel") was the Warden at PBSP. (Id. at 4.)
28 Defendant M.A. Cook ("Cook") was the Associate Warden. (Id.) Defendant Dayton W.

3

1 Conover ("Conover") was the Correctional Plant Manager. (Mot. Summ. J. at 3.)
2 Defendant Fred Stoner ("Stoner") was the Correctional Food Manager. (Id.) Plaintiff alleges
3 that defendants Cook, Conover, and Stoner were "responsible for the recommendations for
4 fulfilling the correct issuance of . . . 'special religious vegetarian diet(s)'" at PBSP. (See
5 Compl. at 4-5.) Defendants R. Orr ("Orr") and J. Williams ("Williams") were Supervising
6 Correctional Cooks. (Id. at 5.) Plaintiff alleges defendants Orr and Williams were
7 responsible for overseeing the making of all special religious vegetarian diet trays. (Id.)
8 Defendant R. Pimental ("Pimental") was an Appeals Examiner at the CDCR Appeals Branch
9 Office in Sacramento. (Mot. Summ. J. at 3.) Defendant N. Grannis ("Grannis") was the
10 CDCR's Chief Inmate Appeals Branch Officer in Sacramento. (Id.)

**DISCUSSION**

I. <u>Motion to Dismiss for Failure to Exhaust Administrative Remedies</u>

Defendants move to dismiss all but one of plaintiff's claims, on the ground plaintiff has failed to exhaust his administrative remedies as required under 42 U.S.C. § 1997e. Specifically, defendants argue, plaintiff only filed an administrative appeal with respect to the meal he was served on June 11, 2008, which is the first meal referenced in the instant action. (Mot. to Dismiss at 6.) Defendants contend any claims based on allegedly deficient meals served after June 11, 2008 are subject to dismissal. (Id.)

A. <u>Legal Standard</u>

Non-exhaustion under § 1997e(a) is an affirmative defense; defendants have the burden of raising and proving the absence of exhaustion. <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003). A nonexhaustion defense should be raised in an unenumerated Rule 12(b) motion. <u>Id.</u> In deciding such a motion, the district court may look beyond the pleadings and decide disputed issues of fact. <u>Id.</u> at 1119-20. If the court concludes the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the complaint without prejudice. <u>Id.</u> at 1120.

//
//

4

B. <u>Exhaustion Requirement</u>

The Prison Litigation Reform Act of 1995 ("PLRA") provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and not left to the discretion of the district court. <u>Woodford v. Ngo</u>, 548 U.S. 81, 85 (2006). "Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." <u>Id.</u> at 89 (internal quotation and citation omitted). Exhaustion of all "available" remedies is mandatory; such remedies "need not meet federal standards, nor must they be plain, speedy, and effective." <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002) (internal quotation and citation omitted).

The State of California provides its prisoners the right to appeal administratively "any policy, decision, action, condition, or omission by the [CDCR] or its staff that the inmate . . . can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." 15 CCR § 3084.1(a).[2] In order to exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal review, submitted on a CDC 602 inmate appeal form; (2) first formal level appeal, to an institution appeals coordinator; (3) second formal level appeal, to the institution warden; and (4) third formal level appeal, to the Director of CDCR. <u>See</u> CCR § 3084.7; <u>Brodheim v. Cry</u>, 584 F.3d 1262, 1264-65 (9th Cir. 2009). A final decision from the Director's level of review satisfies the exhaustion requirement under § 1997e(a). <u>See id.</u> at 1265.

An action must be dismissed unless the prisoner first exhausted his available administrative remedies before he filed suit. <u>McKinney v. Carey</u>, 311 F.3d 1198, 1199 (9th Cir. 2002).

---

[2] Unless otherwise noted, all further references to code sections are to title 15 of the California Code of Regulations.

5

C.  Exhaustion of Remedies

Defendants' exhaustion argument is based on their assertion that plaintiff's complaint is comprised of several discrete claims, each arising out of an individual meal plaintiff deemed inadequate, rather than a single claim based on an inadequate religious diet. (Mot. to Dismiss at 6) (stating "[p]laintiff's claims are identified by dates of occurrence"). Defendants acknowledge that plaintiff raised the first of such assertedly discrete claims, claims pertaining to the June 11, 2008 meal, in an administrative appeal, PBSP Log. No. 008-01689. (Id. at 3.) Defendants also acknowledge that plaintiff pursued said appeal through the Director's level of review, thereby exhausting the claim. (Id. at 3-5.) Defendants argue, however, that plaintiff failed to pursue administrative appeals as to any other meals, and, consequently, that "the claims after June 11, 2008 . . . should be dismissed." (Id. at 7.)

The exhaustion requirement of the PLRA is intended to serve a number of purposes, including providing an opportunity for correction officials to address complaints internally, deterring frivolous lawsuits, and creating an administrative record allowing courts to evaluate the relative merits of claims. See Porter, 534 U.S. at 525. "The primary purpose of a grievance," however, "is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation." Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).

"[A] prison's own grievance process, not the PLRA, determines how detailed a grievance must be to satisfy the PLRA exhaustion requirement." Id. Under the Code of Regulations, an inmate is required to "describe the specific issue under appeal and the relief requested." See 15 CCR § 3084.2. The former version of § 3084.2 in effect when plaintiff filed his administrative appeal was even more vague, instructing the inmate "to describe the problem and action requested." See 15 CCR § 3084.2 (amended 2011). Where "a prison's grievance procedures are silent or incomplete as to factual specificity," as is the case with California's procedures here, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." See Morton v. Hall, 599 F.3d 942, 946 (9th Cir. 2010) (internal quotation and citation omitted). A grievance "need not contain every fact necessary to prove each element of an eventual legal claim." Griffin, 557 F.3d at 1120.

6

Here, plaintiff filed an administrative appeal that provided prison officials with notice that he had been receiving and was continuing to receive nutritionally inadequate meals that failed to comply with the legal requirements for religious vegetarian diets. (See Decl. L. Stocker Supp. Mot. to Dismiss, Ex. A.) Beginning at the first level of the administrative grievance procedure, plaintiff made clear that the vegetarian dinner was "insufficient," not only at dinner on June 11, 2008, but also "on 6/9/08, as well as numerous days beforehand." (Id.) He noted that the "vegetarian menu" was "below standard" and asked that PBSP "revise/renew all vegetarian menus." (Id.) At later levels of review, plaintiff specified that the problem had persisted for "two (2) years" and that "vegetarian diet trays [had] been continuously shorted on portions." (Id.) Moreover, defendant Horel, in his Second level review decision, acknowledged that plaintiff's appeal covered problems with vegetarian meals occurring "on numerous occasions" and that plaintiff was requesting that the vegetarian menu be "redone." (Id.)

In sum, rather than constituting separate and distinct causes of action, the allegations in the complaint describing specific meals, and meals provided over a span of time, comprise aspects of the overall inadequate diet about which plaintiff notified corrections officials in his administrative appeal. Those allegations, encompassed within plaintiff's First Amendment and RLUIPA claims, are intertwined to such extent that the same administrative appeal suffices for purposes of exhaustion. Put another way, the problems described in the appeal were part of PBSP's alleged continuing pattern of failing to provide the religious vegetarian diet required by federal law.

Accordingly, defendants' motion to dismiss will be denied.

II.  Motion for Summary Judgment

    A.  Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

7

dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Id. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" See id at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge).

8

B.    First Amendment Right to Free Exercise of Religion

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)). Under the Free Exercise Clause, inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987). To raise a viable claim under the Free Exercise Clause, a prisoner is not required to objectively demonstrate that a central tenet of his faith is burdened; rather, the appropriate test is whether the prisoner's belief is "sincerely held" and "rooted in religious belief." Shakur, 514 F.3d at 884-85 (finding district court impermissibly focused on whether consuming Halal meat is central tenet of Islam, rather than whether plaintiff "sincerely believe[d] eating kosher meat [was] consistent with his faith").[3] As the Ninth Circuit has observed, the mandates of a religion are not merely "what is minimally required of adherents of a religion" but include "what the individual human being perceives to be the requirement of the transhuman Spirit to whom he or she gives allegiance." See Peterson v. Minidoka County School Dist., 118 F.3d 1351, 1357 (9th Cir. 1997).

Even where a prison regulation impinges on an inmate's First Amendment religious rights, however, such restriction is valid if it is "'reasonably related to legitimate penological interests.'" See O'Lone, 482 U.S. at 349 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). A prisoner's right to free exercise of his religion "'may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.'" See Ward v. Walsh, 1 F.3d 873, 876 (9th Cir. 1993) (quoting O'Lone, 482 U.S. at 348). Prison officials bear the burden of showing the restriction was reasonably related to a legitimate penological objective. See Ashelman v. Wawrzaszek, 111 F.3d 674, 677-78 (9th Cir. 1997).

In Turner, the Supreme Court identified four factors relevant to a court's

---

[3] The sincerity of plaintiff's religious beliefs is not at issue here. (See Mot. Summ. J. at 7.)

determination of whether a restriction that infringes a prisoner's rights is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the restriction and the legitimate governmental interest put forward as its justification; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is an "absence of ready alternatives," or, instead, whether the regulation constitutes an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90 (internal quotations and citations omitted).

### C. Religious Land Use and Institutionalized Persons Act

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).[4]

RLUIPA differs from "traditional First Amendment jurisprudence in at least two ways." See Greene v. Solano County Jail, 513 F.3d 982, 986 (9th Cir. 2008). First, Congress expanded the reach of the protection to include "any 'religious exercise,' including 'any exercise of religion, whether or not compelled by or central to, a system of religious belief.'" See id. (quoting Cutter v. Wilkinson 544 U.S. 709, 715 (2005); 42 U.S.C. § 2000cc-5(7)(A)). "RLUIPA 'bars any inquiry into whether a particular belief or practice is 'central' to a prisoner's religion.'" Greene, 513 F.3d at 986 (quoting Cutter, 544 U.S. at 725 n.13). Second, as opposed to the "deferential rational basis standard" of Turner v. Safely, 482 U.S. 78, 89-90 (1987), "RLUIPA requires the government to meet the much stricter burden of

---

[4] "Institution" as defined in 42 U.S.C. § 1997 includes state prisons.

1 showing that the burden it imposes on religious exercise is 'in furtherance of a compelling
2 governmental interest; and is the least restrictive means of furthering that compelling
3 governmental interest.'" Greene, 513 F.3d at 986 (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)).

    D. Analysis

        1. Lack of Authority to Change Menu

In support of their motion, defendants have not provided any evidence from which the Court can make findings either as to the four Turner factors for assessing plaintiff's First Amendment claim or as to the "compelling governmental interest" test for assessing plaintiff's RLUIPA claim. Rather, defendants argue "they were not the cause of any harm to [p]laintiff because they lacked the authority to modify the state mandated menu followed at [PBSP]." (Mot. Summ. J. at 7.)

According to defendants, PBSP provides inmates with meals that are based on standardized menus generated by CDCR "in consultation with dieticians" (Decl. R.Orr Supp. Mot. Summ. J. ¶ 2), and CDCR has "identified and approved alternate entree substitutions for inmates . . . requesting a vegetarian meal" (id.). Further, according to defendants, the alternate-entree program for vegetarians at PBSP follows the standardized menu guidelines (id. ¶ 3), and "[t]he Food Services Department at [PBSP] cannot deviate from the Standardized Menu" (id. ¶ 2), which menu "mandates portion sizes and protein alternatives" (id.). As noted, defendants contend they cannot be the cause of any constitutional violation because they have no control over this vegetarian menu. (See Mot. Summ. J. at 7-8.)

Citing Estate of Brooks v. United States, 197 F.3d 1245, 1248 (9th Cir. 1999), defendants assert that a prison official is not liable for a constitutional violation when he does no more than follow a policy over which he has no control. (See Mot. Summ. J. at 8.) In Estate of Brooks, a federal detainee, Brooks, was held in pretrial detention by the County of Alameda for twelve days without being arraigned. Id. at 1246. After he was released, Brooks brought an action under 42 U.S.C. § 1983 against several defendants, including the County. Id. at 1247. The Ninth Circuit upheld the district court's dismissal of the action as against the County, on the ground that the County was acting pursuant to a state statute,

11

1 California Penal Code § 4005(a), which requires county sheriffs to "receive, and keep in the
2 county jail, any prisoner committed thereto by process or order issued under the authority of
3 the United States, until he or she is discharged according to law." Id. at 1248. In so holding,
4 the Ninth Circuit specifically noted there was no allegation "that the County failed to follow
5 . . . the mandates of the state statute [or] that the statute itself is unconstitutional." Id. Here,
6 by contrast, plaintiff makes both such allegations, specifically, that PBSP fails to follow
7 CDCR dietary guidelines and that the guidelines themselves are unconstitutional as applied
8 to religious vegetarian inmates. See e.g., Compl. at 8 (alleging "June 11, 2008 evening
9 special religious vegetarian diet meal tray was missing food items [including] the substituted
10 [6 oz.] portion of beans"); id. at 9, 14, 15 (alleging meat products were found in vegetarian
11 diet trays); id. at 11 (alleging "[v]egetarians are not on the overall state standardized menu,
12 which in essence denies vegetarians sufficient food items and protein factors"). In short,
13 Estate of Brooks is distinguishable.

14 Moreover, defendants have provided only minimal evidence of what the CDCR's state
15 standardized diet requires for approved vegetarian inmates. (See Orr Decl. at 2:9-10.)
16 Defendants fail to submit a copy of the guidelines or any menus for the time in question, nor
17 does the Court have before it any evidence showing how any such diet comports with
18 recognized basic nutritional needs.

19 Defendants also fail to show what procedures they follow for purposes of maintaining
20 compliance with the standardized menu guidelines. Defendants provide no information as to
21 how meals are prepared at PBSP pursuant to CDCR policy, let alone how vegetarian meals
22 are prepared and monitored for compliance. Accordingly, the Court has no way to assess
23 whether plaintiff's meals were in fact prepared in accordance with the state standardized
24 menu. Defendants' conclusory assertions to such effect are insufficient.

25 Further, plaintiff has provided evidence sufficient to raise a material dispute as to
26 whether PBSP followed any dietician-approved nutritional guidelines, let-alone CDCR's
27 state-standardized guidelines as purportedly adapted for vegetarians. Both the verified
28 complaint and the declarations submitted in opposition to summary judgment detail repeated

12

United States District Court
For the Northern District of California

1 violations observed with respect to the preparation of religious vegetarian meals at PBSP.

2 Specifically, plaintiff has presented evidence of the following:

3  – A surplus of Teasdale beans are being served as a protein alternative between three and four times per week. They are served cold from a can and have a foul taste, making them inedible. (Compl. at 8, 15-16, 19-22; Pl. Decl. at 2; Terflinger Decl. at 2, 11.)

– Served salad often was rotten or otherwise inedible. (Compl. at 14, 16; Pl. Decl. at 6, 9.)

– Served vegetables often were burnt, overcooked, or otherwise inedible. (Pl. Decl. at 6, 9, 16; Terflinger Decl. at 5-6.)

– Items, including protein items, often were missing from meal trays or served in inadequate portions.[5] (Compl. at 7, 10; Pl. Decl. at 3, 11; Terflinger Decl. at 3-4.)

– Meals were served cold despite state regulations requiring two hot meals per day. (Pl. Decl. at 5; Dec. L. Stocker Supp. Mot. Summ. J., Ex. B.)

– Meat or meat gravy was placed on vegetarian trays. (Compl. at 9, 15; Pl. Decl. at 10.)

– Inadequate amounts of cheese were regularly served as a protein alternative. (Compl. at 10, 18; Pl. Decl. at 4-5; Terflinger Decl. at 4, 6-8.)

– Regular non-vegetarian trays received larger portions of non-meat items than vegetarian trays received of these same non-meat items, such as spiced beans. (Terflinger Decl. at 12.)

– Correctional cooks and kitchen staff regularly failed to investigate complaints. (Pl. Decl. at 2-3; Terflinger Decl. at 2.)

– Staff stopped providing plaintiff with menus for a three-week period in 2009 in order to discourage him from monitoring his diet. (Compl. at 21.)

Viewing the above evidence in the light most favorable to plaintiff, as the Court is required to do on summary judgment, the Court finds defendants fail to establish the PBSP religious vegetarian diet complied with any nutritional guidelines, let alone CDCR nutritional guidelines. Although as noted above, defendants have not submitted the CDCR guidelines to the Court, the CDCR has a constitutional duty to provide inmates "with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." See McElyea,

---

[5] Plaintiff apparently determined such items were missing by comparing his tray to the printed food service menus and/or to regular trays on which non-meat items such as noodles and tortillas were served. (See Compl. at 8-9, 10, 16, 17, 23.)

13

833 F.2d at 198. Even if the Court assumes for purposes of the instant motion that the CDCR guidelines satisfy such constitutional mandate, however, plaintiff has raised a genuine issue of material fact as to whether the meals he received were so lacking in nutrition on a sufficient number of occasions as to deprive him of adequate food necessary to maintain his health, thereby violating his religious rights.

Accordingly, to the extent defendants' motion is based on the above-discussed defense, defendants have failed to show they are entitled to summary judgment.

### 2. Qualified Immunity

Defendants additionally move for summary judgment on all claims on the ground that, as government officials, they are entitled to qualified immunity.

Qualified immunity protects government officials from civil liability for actions taken within their official discretion insofar as those actions do not violate clearly established statutory or constitutional rights of which a reasonable official would have been aware. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is not merely a defense to liability; rather, when applicable, qualified immunity protects government officials from lawsuits and, hence, from the burdens of litigation. See Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223, 236 (2009).

A court considering a claim of qualified immunity must determine (1) whether the plaintiff has alleged the deprivation of an actual constitutional right and (2) whether such right was clearly established such that it would be clear to a reasonable actor that his conduct was unlawful in the situation that confronted him. See Pearson, 555 U.S. at 236. Courts may exercise their discretion in deciding which prong of the test to address first, in light of the particular circumstances of the case. Id. (overruling prior authority under which courts were required to determine issue of deprivation before reaching issue of whether right clearly established).

Here, as discussed, the verified factual allegations and plaintiff's other evidence, when viewed in the light most favorable to plaintiff, are sufficient to raise a triable issue as to whether defendants' conduct violated plaintiff's rights under the First Amendment and

14

1 RLUIPA. As further discussed, it was clearly established at the time of such alleged
2 violations that prison officials may not substantially burden an inmate's right to the free
3 exercise of religion without some legitimate penological justification. Based on the record
4 presently before the Court, it cannot be said that, as a matter of law, it was objectively
5 reasonable for defendants to believe their conduct was lawful.

6 Accordingly, summary judgment on the issue of qualified immunity will be denied.

7      3.   <u>Individual Defendants Pimental and Grannis</u>

8 Defendants argue that defendants Pimental and Grannis are entitled to summary
9 judgment because plaintiff cannot establish a First Amendment or RLUIPA claim based on
10 the denial of his administrative appeals. The Court agrees. Plaintiff's petition alleges no
11 wrongdoing by either defendant Pimental or Grannis directly related to the meals he
12 received. Rather, said two defendants are named in the complaint solely because they
13 reviewed and denied, or partially denied, plaintiff's inmate appeals. (<u>See</u> Compl. at 17-18.)
14 There is no constitutional right, however, to a prison administrative appeal or grievance
15 system. <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988). Consequently, an incorrect
16 decision on an administrative appeal or a failure to handle it in a particular way does not
17 amount to a violation of plaintiff's constitutional rights. <u>See id.</u>

18 Accordingly, summary judgment will be granted as to defendants Pimental and
19 Grannis.

20 III.   <u>Motion for Order Re: Photocopying of Opposition</u>

21 The instant motion for photocopies is plaintiff's second such request.

22 Earlier, on December 17, 2010, plaintiff filed a document titled "Plaintiff's Motion to
23 Show Cause," wherein he asked the Court to issue an order directing PBSP to provide him
24 copies of legal documents in excess of fifty pages. Specifically, plaintiff sought copies of his
25 opposition to defendants' motion for summary judgment, which motion he subsequently filed
26 on January 21, 2011. According to plaintiff, prison regulations impose a fifty-page limit on
27 the number of copies staff may make for an inmate.

28 The Court denied plaintiff's previous request on the grounds it was premature and

1 plaintiff had not shown good cause for such an order. (See Docket No. 24.) The Court also 2 informed plaintiff that he was not required to resubmit exhibits that had already been 3 submitted by defendants or otherwise were contained in the record. Plaintiff, however, has 4 ignored such direction and twice resubmitted, once in support of his opposition to dismissal 5 and again in support of his opposition to summary judgment, lengthy exhibits that had been 6 provided by defendants with their motion to dismiss. Plaintiff also submitted, in support of a 7 supplemental opposition to defendants' motion for summary judgment, a lengthy collection 8 of irrelevant documents. (See Docket No. 33 (attaching declarations and administrative 9 appeals from inmates adhering to vegan diet).)

10 Consequently, plaintiff again fails to show good cause for an order requiring the 11 requested photocopies. Moreover, it is apparent that counsel for defendants already has 12 obtained copies of plaintiff's opposition and supplemental opposition to the motion for 13 summary judgment. (See Docket No. 34.) Under such circumstances, the Court deems the 14 opposition served, making it unnecessary for plaintiff to serve defendants with a copy in this 15 instance. Lastly, to the extent plaintiff seeks copies of his own filings in opposition to 16 defendants' motions, beyond the number of pages PBSP will provide to him, the Court notes 17 that the motions are now fully briefed, and plaintiff fails to show any need for such copies at 18 this stage of the proceedings.

## CONCLUSION

20 For the foregoing reasons, the Court orders as follows:

21 1. Defendants' motion to dismiss is hereby DENIED.

22 2. Defendants' motion for summary judgment is hereby GRANTED in part and 23 DENIED in part as follows:

24 a. Summary judgment is GRANTED in favor of defendants Pimental and Grannis on 25 all claims.

26 b. Summary judgment is DENIED with respect to plaintiff's claims against 27 defendants Horel, Cook, Conover, Stoner, Orr, and Williams.

28 3. Defendants' objections to plaintiff's supplemental evidence on procedural and

16

evidentiary grounds (Docket No. 35) are hereby OVERRULED as moot, as the Court has not relied on such evidence in determining the instant motions.

4. Plaintiff's second request for a court order permitting photocopies in excess of fifty pages is hereby DENIED.

5. The case is hereby REFERRED to Magistrate Judge Nandor Vadas for settlement proceedings on plaintiff's claims against the remaining defendants. Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Vadas's calendar will permit. Magistrate Judge Vadas shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon.

<u>The Clerk is directed to serve Magistrate Judge Vadas with a copy of this order and to notify Magistrate Judge Vadas that a copy of the court file can be retrieved from the court's electronic filing database (ECF).</u>

The Clerk is further directed to terminate R. Pimental and N. Grannis as defendants on the court docket.

This order terminates Docket Nos. 15, 18, and 28.

IT IS SO ORDERED.

DATED: September 19, 2011

_____
MAXINE M. CHESNEY
United States District Judge